```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MERRILL LYNCH & CO., INC., MERRILL           :
LYNCH CAPITAL SERVICES INC., and ML IBK      :
POSITIONS, INC.,                             :    02 Civ. 7689 (HB)
                                             :
              Plaintiffs,                    :    OPINION & ORDER
                                             :
       - against -                           :
                                             :
ALLEGHENY ENERGY, INC.,                      :
                                             :
              Defendant.                     :
------------------------------------------------------------------------x
ALLEGHENY ENERGY, INC., AND ALLEGHENY        :
ENERGY SUPPLY CO., LLC.,                     :
                                             :
              Counterclaim-Plaintiffs,       :
                                             :
       - against -                           :
                                             :
MERRILL LYNCH & CO., INC., and MERRILL       :
LYNCH CAPITAL SERVICES, INC.,                :
                                             :
              Counterclaim-Defendants.       :
------------------------------------------------------------------------x
```

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiffs filed this action on September 24, 2002 and Defendants filed counterclaims. A bench trial was conducted on May 9-12, 16-18, and 20, 2005, with respect to the damages due to Merrill Lynch on its breach of contract claim and with respect to Allegheny's remaining counterclaims for fraudulent inducement and breach of contract. The parties submitted post-trial briefs on May 27, 2005, closing arguments were held on June 3, 2005, and the action became *sub judice* after the parties submitted proposed findings of fact on June 10, 2005.

## I.  PROCEDURAL HISTORY

Plaintiffs Merrill Lynch & Co., Inc., Merrill Lynch Capital Services Inc., and ML IBK Positions, Inc. (collectively "Merrill Lynch") filed this action on September 24, 2002 for a single breach of contract claim. Defendants and Counterclaim Plaintiffs Allegheny Energy, Inc., Allegheny Energy Supply Co., LLC. (collectively "Allegheny") filed counterclaims for

rescission, fraudulent inducement, breach of contract, and breach of fiduciary duty. Merrill Lynch moved to dismiss and on November 25, 2003, this Court (1) granted Merrill Lynch's motion to dismiss Allegheny's rescission claim, the punitive damages claim based upon fraudulent inducement, and the jury demand; and (2) denied Merrill Lynch's motion to dismiss the fraudulent inducement claim, the breach of contract claim, the breach of fiduciary duty claim, and the punitive damages claim based upon a breach of fiduciary duty. Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 2003 U.S. Dist. LEXIS 21122 (S.D.N.Y. May 30, 2003). Subsequently, Allegheny moved for leave to amend its counterclaims. On October 26, 2004, the Court granted Allegheny leave to amend but not with respect to punitive damages on its fraud counterclaim or its renewed demand for a jury trial. The Court also denied production of two reports written in connection with an internal investigation sought by Allegheny. Merrill Lynch, 2004 U.S. Dist. LEXIS 21543 (S.D.N.Y. Oct. 22, 2004). On April 12, 2005 the Court granted summary judgment to Merrill Lynch with respect to its breach of contract claim and dismissed Allegheny's counterclaims for negligent misrepresentation, breach of fiduciary duty and aiding and abetting such a breach. Merrill Lynch, 2005 U.S. Dist. LEXIS 6073 (S.D.N.Y. Apr. 12, 2005). On May 9, 2005 a bench trial commenced to determine the damages owed to Merrill Lynch on its breach of contract claim and Allegheny's breach of contract and fraudulent inducement claims, the only remaining claims.

## II.   FINDINGS OF FACT

This case arises out of Allegheny's purchase of Merrill Lynch's energy-commodities trading business known as Global Energy Markets ("GEM") for $605 million ($490 million in cash and a 2% equity interest in Allegheny Supply ("Supply")).[1] It's a saga of missteps taken by two of America's largest and most respected entities and which it is sad to say can only be characterized as having happened through a combination of complacency and greed. Merrill Lynch brought suit to enforce a provision in the Asset Contribution and Purchase Agreement

---

[1] Allegheny Energy is an energy utility with over 5,000 employees that provides energy services to customers in four states. Merrill Lynch is one of the world's leading financial management and advisory companies, with offices in 36 countries and total client assets of approximately $1.6 trillion, at the end of 2004.

("Purchase Agreement") that provided that if Allegheny did not contribute certain assets to Supply, Merrill Lynch had the right to "put" its equity position in Supply back to Allegheny Energy for $115 million plus interest. Allegheny brought its counterclaims against Merrill Lynch for *inter alia* fraudulent inducement and breach of contract.

### A. Negotiations to Sell the GEM

In 2000, Merrill Lynch, Allegheny's long time financial advisor began at Allegheny's behest to advise it about acquiring a sophisticated energy trading operation. After a discussion of several potential transactions, a senior investment banker at Merrill Lynch suggested that Allegheny consider the acquisition of Merrill Lynch's own energy trading operation, GEM. At or about that time, and in order to avoid any potential conflict, Allegheny retained Salomon Smith Barney to replace Merrill Lynch as its financial advisor and on September 1, 2000, the parties met and negotiations for GEM began in earnest. Both sides conducted extensive two-way due diligence because part of the purchase price included an equity stake in Supply. In addition to a "revered" financial advisor, Salomon Smith Barney, Allegheny retained a "revered" law firm, Sullivan & Cromwell, with a specialty in mergers and acquisitions. To top it off, Price Waterhouse Coopers was retained as their auditor. While in light of what happened it seems incredible, Allegheny paid some $6 million over a period of four months for the combined services of these due diligence experts. (Blasko Tr. at 885:09.)

#### i. September Financial Statements

Allegheny was promised financial information about the GEM business unit within one week of the September 1 meeting, and it was understood that the forthcoming financial information was to include historical financial performance and projections. On September 8, a fax was sent to Allegheny that reported GEM's operating revenues for 1999 as $49 million, after tax earnings of $25 million and year-end operating revenues of $72.5 million. (DX 70.) The plot thickens when Flavio Bartmann, the head of the deal team at Merrill Lynch and listed signatory on the cover page, claimed on the witness stand that he had neither sent the fax nor authorized it to be sent. (Flavio Bartmann Tr. at at 227:1.) Apparently his secretary sent it,

although no one at Merrill Lynch bothered to investigate or explain on the stand who instructed her to do so. On September 22, a second identical set of financial statements was delivered to Allegheny, to this Bartmann admits authorship. (DX 85.)

Merrill Lynch does not dispute the fact that neither statement was the product of the Finance Department, the department where, as the evidence made crystal clear, all such statements must be initiated. Speculation points to Dan Gordon as the culprit who, while at the helm of GEM had in a related transaction, embezzled $43 million dollars from Merrill Lynch. In his plea allocution on that criminal charge, Gordon stated that, as per a decision made by his superiors, he "alter[ed] certain data" in connection with the transaction to make the GEM "look more profitable," (DX 300), about which more later. It is worth noting that the revenues and projections forwarded in September were higher than those in Merrill Lynch's books and records, (DX 719, DX 311) records one might have thought Alleghey would have sought and perused. Bartmann claims not to have known the financial information was unreliable and had no reason to suspect it did not come from the Finance Department. (Bartmann Tr. at 229:23.) At best, Bartmann, as head of the deal team, was careless when he failed to discover that the financial information sent twice, at least once with his knowledge, was unreliable.

### ii. Valuation of the Williams Contract

Allegheny requested year-to-date financials for GEM that included profits and losses ("P&L") attributable to the Williams Contract, GEM's largest single trading asset. (DX 327.) Williams Energy Marketing & Trading is a Southern California energy provider. The Williams Contract gave Merrill Lynch a series a daily options for a period of 18 years to call upon Williams for up to 1,000 MW of electricity generated from power plants in Southern California. (PX 36.) This request came about during a two day due diligence session. During these negotiations, Allegheny's Executive Director of Business Development, Peter Dailey, told Gordon that without current figures for GEM, Allegheny was prepared to pursue a deal with Morgan Stanley. (DX 112.) In an email to the Merrill Lynch deal team the next morning Gordon stated that it was "imperative" that Merrill Lynch "immediately" provide year-to-date financials including the Williams P&L. At the second day of the due diligence meeting,

Bartmann informed Allegheny's representatives that Merrill Lynch was provisionally recognizing $32 million in Profit on the Williams Contract. Bartmann and Ahmass Fakahany, a Finance Director at Merrill Lynch, reached and sent on this "provisional" or "indicative" figure with little or no time for reflection and opined that the valuation methodology was still in development. (Ahmass Fakahany Tr. at 844:02-04.)

On October 11, Bartmann sent a third financial statement to Allegheny reflecting year-to-date financial reserves, including the release of a Williams Reserve of approximately $32 million to be added to revenues. (DX 110.) Again the document appears to come from Bartmann but once again Bartmann, the head of the deal team, denies he sent it. Of even more concern, Fakahany testified that he did not authorize Bartmann to send such a financial statement and there was no testimony that the document came from the Finance Department, the channel from which all such documents must emerge.

Allegheny contends that this "indicative number" of $32 million profit recognition under the Williams Contract must have been false and other members of the deal team from Merrill Lynch questioned how the figure was reached. (DX 107, DX 108.) Further, David Chung, an analyst hired by Merrill Lynch specifically to value the Contract, initially yielded a $10.5 million loss in his calculations. (DX 131.) Upon receiving Chung's work, a member of Merrill's Risk Management Department emailed a colleague that "[g]iven the interest in recognizing a positive P&L, I am sure there will be some rework on that (sic) attached analysis." (DX 133.) Chung testified that this model included "performance risk" reserve that was an arbitrary compromise that he established to split the difference between recognizing the full expected value of the Williams Contract for the following summer, or none of that value. (Chung, Tr. at 665:00-66:12, 748:00; PX 178 at MER 458627.) Upon inspection of this valuation, Ahmass Fakahany rejected this reserve since it lacked a firm factual basis and an arbitrary assumption of this nature was not a proper reserve under GAAP. (PX 186; Stephen Ryan Tr. at 12:86:00.) In the last week of October, Merrill Lynch recognized its first profit on the Williams Contract, in the amount of $33 million. (PX 338 at A 21833.) Allegheny argues that this was all done as a measure to inflate the value of the Williams Contract but the facts

show that this was less part of a conspiracy and more part of an effort to attach value to a complicated asset with extreme fluctuations in value dependent on the demand for energy.

In any event, Allegheny was never in the dark about the performance of the Williams Contract. Allegheny was given Chung's models as well as week-to-week P&L on the Williams Contract. As a consequence, Allegheny could visualize the wild fluctuations in P&L and realized the incredible difficulty in nailing down any sort of concrete value for the Willliams Contract. In the end it was Merrill Lynch that provided the most conservative estimate of its worth. At the beginning of December with the signing of the Purchase Agreement a few weeks away, Merrill Lynch estimated the Williams Contract value at some $643 million (PX 338), while around that same time Salomon calculated the value of the Contract at $831 million. (PX 318.) In March 2001, about the time of the closing (the closing was several months after the signing), Allegheny measured its worth to be approximately $750 million. (PX 450.) These figures were reached by sophisticated analysts who were hired to protect Allegheny by making independent determinations about the value of the business' assets that Allegheny was about to acquire.

### B. Signing and Closing

An agreed upon price of the GEM was eventually set at $605 million. This price included a premium of $230 million over the agreed upon book value. Merrill Lynch claims that it only discovered toward the end of December that the financial information provided the past September was "significantly different" from the Finance Department's records, put another way, they had overstated the operating revenues. (It is interesting to note, and perhaps a reflection of the times, that even now Merrill Lynch refused to talk in the more accurate and honest terms of wrong or misleading.) (Bartmann Tr. at 276:02-09; John Lynch Tr. at 340:02-05.) Finally, over the New Year's Holiday, updated financials were prepared and validated, principally by Alan Levy, a member of Merrill Lynch's Finance Department. (Alan Levy Tr. at 368:01-19.) Allegheny contends that these financials were still inaccurate because they omitted a $13 and $15 million dollar month-end loss on the Williams Contract that had been recorded at the management level. In fairness, the facts show that this was not done to dupe

Allegheny and that those losses were fully disclosed in Chung's valuation spreadsheets that showed the weekly P&L.

Late in the game as this was, on January 5, Merrill Lynch did fax the new updated financial statements to Sullivan & Cromwell's offices, where the Allegheny deal team was meeting. (PX 400; Peter Dailey Tr. at 1164:18-25.) Now the scene shifts to the ineptitude of the other industry giant, Allegheny and to its "revered" $6 million due diligence team. Merrill Lynch was prepared to represent in the Purchase Agreement that the January 5 financials were accurate and to have them incorporated as a schedule to the Purchase Agreement. (Peter Kelly Tr. at 124:09-10.) These financials reflected lower operating revenues than those in the September and October financial statements. According to Allegheny, it "rejected" the January 5 financials and claims that it was understood by all the parties that the deal was consummated on the old September and October financial data. But this is belied by the fact that the narrative representations contained in Schedule 3.12 of the Purchase Agreement were renegotiated at the time of signing and as a consequence of the new financials and nowhere in the representation is there mention of any earlier data. (PX 001A at MER 30414.) Moreover, as Peter Dailey testified, he was told by Bartmann that the new updated financials should be substituted for the previous ones. (Dailey Tr. at 1167:01-16.) The January financials were thus bound behind Schedule 3.12, Business Selected Data, in the final deal documentation. (PX 402.) Allegheny did not raise much of a fuss upon receiving the new financial information. Indeed no one paid much attention to the new figures and at trial simply blamed one another for having gone along so meekly at the signature ceremony. This is despite the fact that the signing could have been postponed to investigate the lower numbers. In the weeks that followed and even at the closing in March, this was not an issue raised by any of the Allegheny deal team. Clearly everyone wanted this deal to go through and either understood or did not care about the changed financial statements or how it might effect its stockholders.

### C. The Falcon Energy Outage Insurance Fraud

In August 2000, Dan Gordon evaded all of Merrill Lynch's internal credit controls and facilitated the sale of $43,000,000 worth of energy "outage" insurance from a make believe company that was merely an off-shore account that funneled the money back to Gordon.

Merrill Lynch's witnesses portrayed this event as an innocent mistake, but it is at best another example of a major financial institution's complacency. (See Vincent DiMassimo Tr. at 517:1-517:6.)

In fairness, the facts as they came out at trial clearly demonstrated that Dan Gordon's fraud with regard to the Falcon Insurance contract was perpetrated against Merrill Lynch and that Allegheny never directly suffered as a result of this deception. When the GEM was sold, Allegheny and its advisors never attributed any value to the Falcon insurance contract so it can hardly have been harmed by the fraud. (Daily Tr. at 1192:14-18.); Kenneth Blasko Tr. at 889:15-90:04.) The facts also show that Allegheny tolerated similar high jinks by Gordon who had been hired by Allegheny, until he was fired in August 2002. (PX 539.)

### III. CONCLUSIONS OF LAW

#### A. Breach of Contract

To prevail on its breach of contract claim, Allegheny must prove by a preponderance of the evidence "(1) the existence of an express warranty, (2) material breach of the warranty, (3) damages proximately resulting from the material breach, and (4) justifiable reliance on the warranty." Metromedia Co. v. Fugazy, et al., 983 F.2d 350, 360 (2d Cir. 1990). Clearly express warranties existed in the Purchase Agreement, and it is apparent that at least some of those warranties were breached by Merrill Lynch's misrepresentations, however, Allegheny has failed to prove that any breach was the proximate cause of its injury. Also, the damages claimed by Allegheny are too speculative and uncertain to serve as a basis for recovery.

##### i. Material Breach of the Warranties

Allegheny claims that Merrill Lynch breached various warranties in the Purchase Agreement through material misrepresentations or omissions about the value and performance of the GEM. A misrepresentation is deemed material if it concerns a fact likely to influence the decision-making process, Ettman v. Equitable Life Assurance Society, 6 App. Div. 2d 697, (2d Dep't 1958); aff'd 5 N.Y.2d 1005 (1959); Williston on Contracts § 1490, i.e., if the misrepresentation or non-disclosure constituted an essential inducement to bargain.

In § 3.12(c) of the Purchase Agreement, Merrill Lynch represented that "[t]he books and accounts and other financial records of the Business [i.e., GEM] … are in all material respects true, complete, and accurate, and do not contain or reflect any material inaccuracies or discrepancies … and have been maintained in accordance with [Merrill's] business and accounting practices." This is a general representation that appears to refer to all the books, accounts and financial records exchanged in contemplation of the transaction. The September and October financial information provided by Merrill Lynch was a material breach of this representation because it was inaccurate and not generated by the Finance Department. However, the last minute January financial data was prepared by the Finance Department and along with Chung's report as well as other data, appears to have been accurate. (DX 250.)

In § 3.12(b), the Purchase Agreement referred to a specific Schedule entitled "Business Selected Data." In that Schedule, Merrill Lynch represented that "[t]he Business Selected Data has been prepared in good faith by the management of the Business based upon the financial records of the Business …" This Section expressly refers only to the January financial data that was bound behind the representation and the facts reflect that it was prepared in good faith and corrected inaccurate information that had been previously supplied. While it was prepared sloppily and contained some mistakes, there is no proof that this financial material was not prepared in good faith or that it is not basically accurate.

In § 3.16, the Purchase Agreement states in relevant part "[t]he information provided by the Sellers to the Purchasers, in the aggregate, includes all information known to the Sellers which in their reasonable judgment exercised in good faith, is appropriate for the Purchasers to evaluate the trading positions and trading operations of the Business." Certainly the September and October financial information was false and at least one employee at Merrill Lynch, Dan Gordon, knew it. All that being said, there is no evidence that Allegheny was ever denied access to any of the GEM's (as well as Merrill Lynch's) books and records for this transaction or for that matter any transaction touching the purchase of the GEM. Any material information that Allegheny complains now was omitted was available to Allegheny and its $6 million dollar due diligence team. While his testimony on the stand was in some material respects incredible, there was no proof that Bartmann had any reason to question the financial

documents that he sent or were sent under his name to Allegheny. While checking such figures should be commonplace in any financial transaction to say nothing of one for over half a billion dollars, the fact is, however, that the September and October financials were replaced by the more accurate ones in January. As such, the cumulative information provided by Merrill Lynch, may have been negligently prepared and forwarded to Allegheny at one time, it was for the most part, complete and prepared in good faith by the time of signing.

### ii. Damages as the Proximate Result

It is not enough that Allegheny show that warranties in the Purchase Agreement were breached. In order to prevail in its breach of contract claims, Allegheny must also show that the misrepresentations or omissions were the proximate cause of reasonably certain damages. See Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A., 176 F3d 601, 605-07 (2d Cir. 1999). Allegheny has a critical problem here because it failed to prove either proximate cause or reasonably ascertainable damages.

To establish proximate cause, or loss causation, the party seeking damages for breach of contract must show that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 205 F.3d 87, 95 (2d Cir. 2001)(emphasis omitted). Cases that interpret this standard conclude that where an "alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss." In re Initial Pub. Offering Sec. Litig., 2005 U.S. Dist. LEXIS 12845 (S.D.N.Y. June, 28, 2005). Here, Allegheny has not produced any evidence to show that the materialization of misstatements or omissions by Merrill Lynch caused Allegheny to suffer a loss.

At trial, none of Allegheny's witnesses could identify any actual injury suffered by Allegheny after it acquired GEM. (Morrell Tr. at 652:00-55:14; Noia Tr. at 976:01-79:16; Jones Tr. at 1082:02-88:25.) In fact, the record shows that in the year after Allegheny purchased the GEM, it "exceeded [their] expectations in terms of overall contribution to the organization." (PX 487 at A1044426.) The 2001 net income projection not only was met, but

it was exceeded ten times over that year. (PX 488 at Z 1057483.) The failure of GEM the following year was not shown to be caused by any breach by Merrill Lynch.

Allegheny argues that it should be entitled to the difference between what it paid and what it would have paid had it known the true facts about Gordon and the financial data as of the purchase date. But cases have repeatedly shown that overpayment alone does not prove causation and a claimant to collect on such a theory must prove that the breach or misrepresentation resulted in an actual injury or loss not attributable to other factors. Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627, 1632 (2005); Lentell, 396 F.3d at 144-75. Allegheny argues that cases like Dura are distinguishable because they involve public securities fraud, and indeed this is a distinction but a distinction without a difference. The Dura Court made it clear that there is no analytic difference between loss causation under Rule 10b-5 and the common law. Dura Pharms, 125 S. Ct. at 1632-33.

Allegheny conflates proximate cause and calculation of damages through its assertion that it is entitled to the difference between the price it paid and the hypothetical "true value" of the GEM at the time of purchase. Allegheny claims that it was deceived into paying a premium for GEM by Merrill Lynch's misrepresentations about GEM's earnings and the quality and integrity of its personnel and this translates directly into money damages. But Allegheny has not been able to overcome the hurdle of proving that the damages, if any, were proximately caused by any of Merrill Lynch's misdeeds, so any discussion of damages, which in this Court's view are too speculative anyway, is misplaced.

Put another way, to prove damages, Allegheny must first prove it suffered actual injury. This invariably necessitates consideration of what happened to the GEM in the months that followed the acquisition. Allegheny got the GEM and received substantial benefit from the company in the following year. Whether Allegheny received the benefit of the bargain cannot be proven through a bald assertion that Allegheny paid too much on the date of acquisition. Allegheny must also prove that any injury, if there was any, was proximately caused by the breach rather than any other factors. Only after finding causation can we move on to the calculation of damages. Allegheny argues that Merrill Lynch's bad acts caused actual injury and this satisfies the test, but they are mistaken. Market forces, beginning with the collapse of

Enron in 2001, appear to be the cause of the eventual harm to the GEM, not Merrill Lynch's inflated representations as to its value in September and October of 2000.

Moreover, Allegheny's claim for benefit-of-the-bargain damages must be based on the "bargain that was actually struck, not on a bargain whose terms must be supplied by hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different." Barrows v. Forest Labs., 742 F.2d 54, 60 (2d Cir. 1984). The possibility that Allegheny would have only agreed to a lesser price had it known the true facts at the time of the purchase especially under the circumstances here is a sympathetic but unavailing and in fact contradicted by the behavior of the Allegheny deal team and its advisors. The January financials were presented before the signing and apart from redrafting the Schedule attached to incorporate them, they gave little pause to the deal team and were not more fully investigated before the closing occurred in March.

It is clear that the only injury Allegheny has proven with reasonable certainty, connected to the actions of Merrill Lynch, is a loss of face and while fair, it is not compensable.

### B. Fraudulent Inducement

To prevail on its claim of fraudulent inducement, Allegheny must prove (1) that Merrill Lynch made a material misrepresentation of fact or omission of fact; (2) Merrill Lynch acted knowingly or with reckless disregard of the truth; (3) Merrill Lynch intended to induce Allegheny's reliance; (4) Allegheny justifiably relied on ML's misrepresentation or omission; and (5) Allegheny suffered injury as a result. Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 N.Y. 2d 112, 119 (1969).

Allegheny argues there was a conspiracy afoot at Merrill Lynch to gain a fraudulent purchase price for its energy trading desk, the GEM. While it is certain that through its agent, Dan Gordon, and perhaps others, Merrill Lynch made material misrepresentations of fact with regard to the financial documents provided to Allegheny, and these documents made the GEM look more attractive for purchase than it really was. The critical problem for Allegheny is with regard to its justifiable reliance on any of the representations or omissions made by Merrill

Lynch. "[I]n assessing the reasonableness of a plaintiff's alleged reliance, [the Court should] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stone path Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003). "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984). Allegheny is undoubtedly a sophisticated party that was represented at every step by competent, experienced, and expensive advisors. Without exploring the parameters of their legal obligations, suffice it to say that by reputation at least they are the best in the business. Further, the evidence shows that Merrill Lynch opened its books and records and accorded Allegheny four months of due diligence. Allegheny cannot now claim to have reasonably relied on non-disclosures as to information that was available had it pursued its due diligence with a little more pizzazz. See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997).

Allegheny argues that because the truth about the financial documents was within Merrill Lynch's peculiar knowledge, any further due diligence by Allegheny would have been fruitless. See Danaan Realty Corp. v. Harris, 5 N.Y. 2d 317, 322 (1959). But this argument is unavailing because two-way due diligence meant that Allegheny had full access to Merrill Lynch's books and records, and this provided Allegheny an independent means for discovering the truth. The misrepresentations of which Allegheny now complains could have been discovered without great difficulty. It would not have taken much effort to discover the $43 million fraudulent insurance contract sold to the GEM by Dan Gordon, and pocketed by him, considering that the entire existence of the insurance company was a sham.

Moreover, Allegheny's fraud claim suffers from the same deficiency as its breach of contract claims in that it has failed to prove that its injury was the result of Merrill Lynch's misrepresentations or omissions. In actions for fraud too, proximate cause (or loss causation) requires a plaintiff to show a direct link between the wrongdoings complained of and the damages alleged. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189,

197 (2d Cir. 2003). As noted above, the GEM's performance exceeded expectations in the year following the sale and Allegheny has not proved that it was harmed by any misrepresentations or omissions by Merrill Lynch.

## IV. CONCLUSION

For the forgoing reasons, the court finds that Allegheny cannot prevail on its breach of contract or fraudulent inducement claims. Accordingly, Allegheny will pay $115,000,000 (one hundred fifteen million dollars) to Merrill Lynch on its breach of contract claim, plus an amount of interest equal to the prime rate of Citibank, N.A., compounded annually, accrued from the closing date of the Purchase Agreement, March 16, 2001, up to and including September 16, 2002, the date Merrill Lynch was eligible to exercise the put option pursuant to § 5.15 of the Purchase Agreement. Merrill Lynch is ordered to return its equity interest in Supply to Allegheny. Allegheny collects nothing on its claims. The Clerk of the Court is directed close any open motions and remove this case from my docket.

**SO ORDERED.**

New York, New York
July 18, 2005

_____
U.S.D.J.